**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ******************************************** | **:** | |
| | **:** | |
| **JOHN D. LANE** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 302CV1038 (AWT)** |
| | **:** | |
| **JEFFERSON PILOT FINANCIAL** | **:** | |
| **INSURANCE COMPANY** | **:** | **March 9, 2004** |
| | **:** | |
| ******************************************** | | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

The plaintiff, John D. Lane ("Lane") filed a Motion for Partial Summary Judgment (the "Motion") with respect to the Defendant's ("Jefferson Pilot Financial") Second, Third, Fourth and Fifth Affirmative Defenses (the "Affirmative Defenses"), as set forth in Jefferson Pilot Financial's Amended Answer and Affirmative Defenses filed April 3, 2003. As explained below, there are genuine issues of material fact regarding Jefferson Pilot Financial's Second and Third Affirmative Defenses and Lane's Motion for Partial Summary Judgment must fail as to

those Defenses. Jefferson Pilot Financial agrees to withdraw its Fourth and Fifth Affirmative Defenses.

Attached is Jefferson Pilot Financial's Rule 56(a)(2) Statement.

## I. BACKGROUND

The plaintiff ("Lane") in this case is a securities broker who applied for and was denied monthly disability benefits by the defendant, Jefferson Pilot Financial Insurance Company ("Jefferson Pilot Financial"). Lane has brought claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA") and the Connecticut Unfair Insurance Practices Act ("CUIPA"). Jefferson Pilot Financial maintains that Lane is not eligible for any monthly disability benefits under the terms of the disability insurance policy in question.

Jefferson Pilot Financial denied Lane's claim because he failed to satisfy a six-month Elimination Period required in the Policy. The Elimination Period is defined in the Policy as the number of days of disability that must elapse in a Period of Disability before benefits are payable. Benefits are not payable, nor do they accrue, during the Elimination Period. The Elimination Period must be satisfied whether an insured is claiming Total Disability or Residual

Disability. Lane claimed to be Residually Disabled. Residual Disability during the Elimination Period is defined as follows:

> **1.4** **Residual Disability or residually disabled,** during the Elimination Period, means that due to injuries or Sickness:
>
> a. you are unable to perform one or more of the important duties of Your Occupation, or you are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and
>
> b. you are receiving care by a physician which is appropriate for the condition causing the disability. We will waive this requirement when in our judgment continued care would be of no benefit to you.
>
> (See Exhibit J).

After review of Lane's claim, Jefferson Pilot was unable to approve disability benefits because Lane continued to work full-time performing all the important duties of his occupation. Evidence of this fact came from Lane and his employer because Lane could not show evidence of loss of time, and Lane's employer indicated that he was working full time performing his duties. Therefore, Lane did not meet the prerequisites for coverage. Any decline in income that Lane reported may have been caused by other factors, but not by Lane's alleged depression.

## II. ARGUMENT

**A. <u>A Genuine Issue Of Fact Exists As To Whether Lane Made Full Disclosure In His Application For The Policy.</u>**

The facts are not clear about Lane's health disclosures made at the time he applied for the Policy. In an application to another insurer, National Life of Vermont, Lane reported that he suffered from anxiety in 1983-1984. (See Exhibit E). He concludes in his current Motion that he suffered from an "adjustment disorder" during the same period. (Motion, page 7). In the May 1994 application (the "trial application") that he submitted to Corporate Compensation Plans ("CCP"), he reported suffering from depression during 1983-1984 due to a move from Colorado. (See Exhibit K). In his September 1994 application (the "formal application") to Jefferson Pilot Financial, he fails to report *any* illness related to stress, anxiety or depression. (See Exhibit C.)

In addition, at the time of application, Lane concealed from Jefferson Pilot Financial and from CCP that he received ten therapeutic sessions with psychologist Dr. Bert Diament from May, 1986 to March, 1987. (See Exhibit B.) These ten visits amount to 42% of Lane's total psychological treatment by Dr. Diament. Dr. Diament's treatment notes for these sessions have been destroyed by his office, but in later sessions with Dr. Diament, Lane's diagnosis by the doctor was, in fact, depression. (Diament depo at pp. 11, 49, Exhibit D). Since Jefferson Pilot Financial had no knowledge of this treatment until it received a report from Dr. Diament during its investigation of Lane's 2001 claim, it was unable to obtain the 1986-87 records prior to their

destruction. Lane concealed his 1986-87 therapy with Dr. Diament in his trial application to CCP, in his formal application to Jefferson Pilot Financial, and in his National Life of Vermont application.

At the time of underwriting, Susan Schoenfeld, the Chubb underwriter who reviewed Lane's application, had knowledge of Lane's National Life of Vermont disclosure regarding anxiety and of an April 6, 1993 medical record from Dr. Geoffrey Gladstein which stated "Face turns red – related to stress" and "C.P. prob. anxiety.[1]" (See Exhibit L). She was unaware of Lane's 1986-87 therapy with Dr. Diament and Lane's 1983-84 depression. (Schoenfeld Affidavit, Exhibit A). Jefferson Pilot Financial does not dispute that Lane informed CCP of his 1983-84 depression in his trial application, and that CCP was its agent. However, even if Jefferson Pilot Financial is imputed to have knowledge of Lane's 1984 depression, there is *no* dispute that Lane concealed his 1986-87 treatment with Dr. Diament from *both* CCP and Jefferson Pilot Financial. The Jefferson Pilot Financial application that Lane completed states, in pertinent part:

> Have you been diagnosed by a member of the medical profession or been treated for: Dizziness, fainting, convulsions, headaches, depression, **stress**, chronic fatigue, paralysis, loss of consciousness, mental or nervous

[1] C.P. is a standard medical abbreviation for chest pain. This was Ms. Schoenfeld's interpretation of the "C.P." found in Dr. Gladstein's records.

> disorder, stroke, or any other disease, syndrome or disorder of the head or brain, spinal cord or nervous system?
>
> (Exhibit C). (Emphasis added).

Dr. Diament destroyed Lane's 1986-87 records in 2000 (Diament depo. at 11, Exhibit D). Jefferson Pilot Financial would have been able to obtain Dr. Diament's 1986-87 records and the corresponding diagnosis if Lane had disclosed this treatment in his 1994 application. However, it was too late to obtain these records when Lane filed his claim in 2001. Even if Dr. Diament provided counseling to both Lane and his wife together, (Diament depo. at 11, Exhibit D), it is likely that Dr. Diament's assessment would have included at least a diagnosis of "stress." Yet, Lane answered "no" when asked about "stress" on *both* his trial and formal applications.

Had Ms. Schoenfeld known of Lane's history with Dr. Diament, she would have notified the reinsurance underwriter to determine whether the reinsurer was willing to accept the risk if Jefferson Pilot Financial continued to pursue Lane's application. If so, she then would have sought records and completely investigated and reviewed Lane's mental health history. (Schoenfeld Affidavit, Exhibit A). Ms. Schoenfeld would *not* have assumed the 1983-84 incident of anxiety or depression was self-limiting and due to the specific stressor of moving from Colorado to Connecticut, as Lane indicated on his National Life of Vermont and trial applications. The ten 1986-87 therapeutic sessions with Dr. Diament, combined with reference to

"anxiety" and "stress" in Lane's medical records and in his National Life of Vermont application, would have raised concern of a more pervasive problem. (Schoenfeld Affidavit, Exhibit A). Therefore, Lane's depression likely would *not* have been considered a "single incident" pursuant to the Medical Manual Underwriting Guidelines ("Medical Manual"). (Schoenfeld Affidavit, Exhibit A). His policy may not have been issued at all, or it may have been issued with a limited benefit period, extra premium, exclusion rider, or limited benefit amount. (Schoenfeld Affidavit, Exhibit A).

In addition, the Medical Manual Guidelines are just that – guidelines. They are not strict rules by which underwriters are bound. Rather, underwriters use their own judgment and discretion in issuing policies. (Schoenfeld Affidavit, Exhibit A). Here, the issuance of Lane's policy was subject to underwriting approval by the insurer, Jefferson Pilot Financial, and by the reinsurer, Paul Revere. Although the underwriters utilize the Medical Manual as a guide, they may and do override the Manual's recommendations at their discretion based upon each individual's circumstances. (Schoenfeld Affidavit, Exhibit A).

Besides the three different versions of Lane's illness stated in his trial application, National Life of Vermont application, and his formal application, he now adds a fourth in his current Motion. Citing certain DSM-III sections referred to in the Medical Manual, Lane asserts that his 1983-84 illness could *only* have been diagnosed as an "adjustment disorder" and not

depression. (Motion, page 7.) (Emphasis added). Lane implies in this assertion that no medical professional at the time could have concluded otherwise. He asks the Court to accept his *ex post facto* and lay diagnosis because the existence of a prior depression might prejudice the outcome of the case against him. Lane's self-diagnosis serves only to add to the disputed facts regarding his disclosures – factual issues that must be resolved at trial.

As a matter of law, the factual dispute concerning Lane's veracity forecloses his Motion for Partial Summary Judgment. A trier of fact must listen to testimony, resolve the factual disputes, and determine whether or not Lane made full disclosure and whether Jefferson Pilot Financial would have treated the application differently if Lane had disclosed all the material information concerning his medical history. Therefore, Lane's Motion fails as a matter of law.

**B. Lane's Testimony That CCP Told Him His 1983-84 Depression Was Not Pertinent To His Disability Application Does Not Relieve Him From The obligation Of Full Disclosure In His Formal Application.**

Lane admits to answering questions falsely on the medical history page in the formal application he submitted to Jefferson Pilot. (Lane Depo. at 527, Exhibit F). He admits to omitting his history of depression in question 1b, and to omitting his use of alcohol in question 3c of the medical history page. (Lane Depo. at 535, Exhibit F). He testified that he wanted a $20,000 per month benefit rate, (Lane Depo. at 528, Exhibit F), and that he omitted the 1983-84

depression purposefully in attempting to qualify for this benefit rate, which was twice the standard policy amount being offered. (Lane Depo. at 533, Exhibit F). "And they told me that when I left this thing out, that they thought they could get me the $20,000 still." (Lane Depo. at 533, Exhibit F).

Jefferson Pilot issued Lane his policy in an "offer of coverage" on October 24, 1994, (Shaw Depo. at 31, Exhibit I), but set the available benefit amount at a reduced $15,000 per month in the event of total disability. (Lane Depo. at 531-33, Exhibit F).

Lane testified that he was told to omit his depression history in his formal application at a meeting in his office, by a person or persons from CCP whom he is unable to identify. (Lane Depo. at 528, Exhibit F). At varying times he refers to he/them as "a man" and "they." Lane says he was told at this time his depression "wasn't pertinent to this application." (Lane Depo. at 530, Exhibit F). Lane also said he believes Frank "Al" Woodall advised him to provide these untruthful answers, different from the answers he gave in May, 1994 on the so-called, "trial application." (Lane Depo. at 529, Exhibit F). Lane testified: "they said, well, we can resubmit the application if you make the change in this area regarding the depression." (Lane Depo. at 531, Exhibit F).

When asked why he changed question 3c on September 7, 1994 to falsely indicate he did not use alcohol, Lane replied, "[g]uess they said that – I don't know. That I couldn't tell you.

Maybe they said that drinking two or three drinks a week is not a big deal. I don't know but – I can't tell you." (Lane Depo. at 535, Exhibit F).

Al Woodall, an independent disability insurance salesman who served as co-broker with CCP on sales of policies to Securities Industry Association firms, (Woodall Depo. at 20, Exhibit G; see also Davis Depo. at 22, Exhibit H), swore he did not even know Lane during the policy application process, that he never discussed Lane's history of depression with him or discussed Lane's medical history during that period. (Woodall Depo. at 33, Exhibit G). He emphatically stated he did not earn any commission from the Lane policy sale, because he was "absolutely not," (Woodall Depo. at 30-31, Exhibit G), involved in the sale. Woodall is certain that his very first meeting with Lane occurred when he delivered Lane's newly issued policy to him in person at Lane's office, presumably in October or early November, 1994, at the request of Phil Davis of CCP. (Woodall Depo. at 26-27, Exhibit G). Woodall testified he does not recall ever meeting with Lane and Phil Davis at the same time. (Woodall Depo. at 33, Exhibit G).

Davis recalled meeting Lane only once, and it was with Al Woodall at Lane's office. (Davis Depo. at 23-24, Exhibit H). Davis remembers, "we spent almost all of the time talking about golf", (Davis Depo. at 23, Exhibit H); and he did not recall whether the meeting occurred before or after Lane bought the policy. (Davis Depo. at 24, Exhibit H).

The Jefferson Pilot Financial disability policy application states, in pertinent part, on page 5, above Lane's signature:

I understand and agree that:

> 2. No agent, broker, or medical examiner has authority to waive the answers to any question, to determine insurability, to waive any of the Company's rights or requirements, or to make or alter any contract or policy…
>
> 8. I have read, or have had read to me, the complete application. All statements and answers in the application are full, complete and true to the best of my knowledge and belief. I understand that any false statements or material misrepresentations shall result in the loss of coverage under the policy.
>
> (See Exhibit C).

Whether Lane was advised by CCP to change his application or whether Lane changed the application without CCP's advice is an issue of fact that must be resolved by the trier of fact at the trial of this matter. Further, regardless of whether CCP advised Lane to change his formal application to Jefferson Pilot Financial and omit the disclosures of depression and alcohol use, the express language in the application is clear. Lane is responsible for his own answers; an agent does not have authority to waive any answers or determine insurability; and all answers must be full, complete and true. Lane signed this application with full knowledge that his answers in the "Medical History" on page 3 to questions 1b and 3c were incomplete and false.

**C. An Incontestability Clause Does Not Bar Defenses When An Insured Withholds Information As To Preexistence of A Disabling Condition, And Cannot Be Used To Extend Coverage Where None Is Provided By The Policy Terms.**

An incontestability clause benefits an insured because it is "comparable to a statute of limitations or a statute of repose." Minnesota Mutual Life Ins. Co. v. Ricciardello, 1997 WL 631027 *2 (D.Conn.) (attached hereto).

In the disability policy issued to Lane, the relevant section provides as follows:

**7.2 Time Limitations on Certain Defenses**

> This policy shall be incontestable, except for nonpayment of premium, after it has been in force for two years after its issue date.
>
> (See Exhibit J).

Incontestability clauses serve to protect the insured and to foster judicial economy by preventing unnecessary litigation. Id., citing 1A John A. Appleman & Jean Appleman, Insurance Law and Practice Sec. 332 at 311 (1981). "Many courts, however, hold that the incontestability clause does not prevent the insurer from contesting liability where the insured did not disclose, or provided misleading information about, a preexisting condition in his application, and the undisclosed condition rendered the insured disabled. See Paul Revere Life Ins. Co. v. Haas, 137 N.J. 190, 644 A.2d 1098 (N.J. 1994); Carlson v. New York Life Ins. Co., 76 Ill.App.2d 187, 202-

03, 222 N.E.2d 363 (1966); Posner v. New York Life Ins. Co., 56 Ariz. 202, 210, 106 P.2d 488 (1940); Anastasion v. Metropolitan Life Ins. Co., 5 Conn. Supp. 157, 158 (1937)." Id. at * 2 n.2.

In Minnesota Mutual, the court denied an insured's motion to dismiss a count for fraud brought by the insurer under Connecticut's Health Insurance Fraud Act, Conn. Gen. Stat. Sec. 53-442, because the insured had made false and misleading statements on his application for disability insurance, notwithstanding the policy's incontestability clause. Minnesota Mutual at *3-*4. Jefferson Pilot Financial's Second and Third Affirmative Defenses similarly plead that Lane made false and misleading statements on his application and, as the Minnesota Mutual court stated, "the legislature has declared that it is no longer necessary to protect frauds in order to further the legitimate policy reasons underlying the incontestability statute." Id. at *4. While Jefferson Pilot Financial has not pled directly to this statute, the Defendant's Second and Third Affirmative Defenses maintain the same substantive specificity.

Courts have affirmed incontestability clauses as properly barring *policy rescission*, but many courts have taken exception by permitting defenses by insurers to denials of disability claims where such claims are tied directly to issues of *policy coverage* that involved false and misleading statements made in policy applications. Jefferson Pilot Financial's Fourth and Fifth Affirmative Defenses seek policy rescission; therefore, it will withdraw those defenses because the incontestability clause bars policy rescission after two years. However, Jefferson Pilot

Financial is entitled to deny a claim when an insured withholds information about a condition and then applies for benefits based upon that condition. This is the basis of Jefferson Pilot Financial's Second and Third Affirmative Defenses.

In Paul Revere Life Ins. Co. v. Haas, 137 N.J. 190, 644 A.2d 1098 (N.J. 1994), an insurer was permitted to defend a denial of coverage as a matter of law, incontestability clause notwithstanding, because the alleged fraud *directly* related to the claim for which the insurer denied coverage. Id. at 201, 644 A.2d at 1104, citing Keaten v. Paul Revere Life Ins. Co., 648 F.2d 299, 301 (5th Cir. Unit B 1981) (providing under Georgia law, after contestability period has run, insurer may not contest validity of policy itself, but 'reserves right to deny any claim if it is not within the coverage as stated under the policy's terms'); Massachusetts Casualty Insurance Co. v. Forman, 516 F.2d 425, 428 (5th Cir.1975) (applying Florida law and holding incontestability claims do not cut off defenses relating to coverage), cert. denied, 424 U.S. 914, 96 S.Ct.1114, 47 L.Ed.2d 319 (1976); Home Life Insurance Co. v. Regueria, 313 So.2d 438,439 (Fla.Dist.Ct.App.1975) (holding that incontestability clauses prohibit challenges to validity of policy but not defenses relating to limitation of coverage), cert. denied, 328 So.2d 844 (Fla.1976); Carlson v. New York Life Insurance Co., 76 Ill.App.2d 187, 222 N.E.2d 363,371 (1966) (noting that clause prohibits insurer from defending on grounds of invalidity, but allows contests on scope of coverage); Metropolitan Life Ins. Co. v. Conway, 252 N.Y. 449, 169 N.E.

642 (1930) (Cardozo, C. J.) (holding that incontestability clause precludes defense of invalidity of policy but not denial of coverage on claim); Minnesota Mut. Life Ins. Co. v. Morse, 487 S.W.2d 317, 319-20 (Tex.1972) (stating that policy is valid after contestability period but insurer may still dispute whether claim covered)." Paul Revere Life Ins. Co., 137 N.J. at 201, 644 A.2d at 1104.

The Paul Revere court held that "an insured may not recover under a disability insurance policy for a disease that he or she intentionally concealed when applying for the policy." Id. at 195, 644 A.2d at 1100. In that case, an insured withheld information about a preexisting eye condition in his application and later claimed total disability based on that same condition. Id. at 195, 644 A.2d at 1101.

This court also distinguished the mere making of misstatements in an insurance policy application from a knowing concealment of a preexisting condition. The court said:

"After a stated period, an incontestability clause grants an insured repose from the rescission of the policy because of misstatements in the application. The clause, however, neither expands the coverage provided by the policy nor prevents the insurer from defending against a claim based upon a disease that the insured knowingly concealed when applying for insurance." Id. at 197, 644 A.2d at 1101.

In this case, the issue before the Court with respect to the incontestability clause is not whether the policy may be rescinded, but whether an issue of fact exists regarding policy coverage for Lane's specific claim. Lane's failure to disclose his preexisting condition on the application submitted to Jefferson Pilot Financial, combined with his failure to disclose his treatment with Dr. Diament in either the trial application or the formal application, precluded Jefferson Pilot Financial from informed consideration of outright denial of his policy or of a different underwriting scheme such as a limited benefit period, extra premiums, an exclusion rider, or a limited benefit amount. (Schoenfeld Affidavit, Exhibit A). Lane's lack of disclosure is tantamount to an expansion of policy coverage, because the preexisting condition was withheld. This is not the purpose of an incontestability clause and Jefferson Pilot Financial may deny benefits based upon Lane's misrepresentation of a preexisting condition for which he now claims disability.

### D. Lane's Depression Was Not A "Sickness" Within The Policy Definition; Therefore, The Preexisting Condition Limitation And The Contestability Clause Do Not Apply.

The Policy requires that Total Disability be caused by a "Sickness," which is defined as follows:

> **1.2 Sickness** means sickness or disease which is *first manifested* after the Issue Date while your policy is in force.

(See Exhibit J). (Emphasis added).

Because Lane's depressive condition had manifested prior to the October 1994 issue date of the policy, his alleged depression in 1999 was not the first manifestation of that illness. Lane's claim is not covered by the policy, because his claim does not arise within policy terms. Lane's reliance upon the incontestability clause and the preexisting condition limitation to recover for a condition not covered by the policy is improper, as a majority of courts have held. Id. at 203, 644 A.2d at 1105. See, e.g., Neville v. American Republic Ins. Co., 912 F.2d 813, 815 (5th Cir. 1990) (holding that under Mississippi law, incontestability clause does not extend coverage of policy to include pre-existing condition); Button v. Connecticut Gen. Life Ins. Co., 847 F.2d 584, 588 (9th Cir.), cert. denied, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed. 2d 250 (1988) (allowing challenge under Arizona law to disability claim, despite incontestability clause, on grounds that policy did not cover pre-existing conditions); Forman, supra, 516 F.2d at 428, cert. denied, 424 U.S. 914, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976) (stating that under Florida law "incontestable clause in a disability policy does not deprive the insurer from defending on the ground that the particular disability was never within the policy coverage"); National Life & Accident Ins. Co. v. Mixon, 291 Ala. 467, 282 So.2d 308, 316 (1973) (finding that disability caused by pre-existing glaucoma not covered under policy although one-year incontestability period had passed); Carlson, supra,

222 N.E. 2d at 371 (incontestability clause does not alter scope of coverage); Morse, supra, 487 S.W. 2d at 319 ("Incontestability clause should not be applied to change the meaning of the terms of the policy or to enlarge its coverage."); The Paul Revere Life Insurance Company v. Damus, Ecker, Rosenthal and Marshall, M.D., d/b/a Emergency Room Medical Associates, Inc., 864 So.2d 442, 28 Fl.L.Weekly D2519 (2003) (insured's eye disease was not a covered "sickness" under the policy because it had first manifested prior to the issuance of the policy, thereby it was not covered despite the policy's incontestability clause).

As stated above, if Susan Schoenfeld had knowledge of Lane's 1983-1984 depression and his ten treatment sessions by Dr. Bert Diament from May of 1986 to March of 1987, this information would have naturally and reasonably influenced her underwriting decisions in evaluating the risk and setting the premium rate. (Schoenfeld Affidavit, Exhibit A).

Therefore, an issue of fact exists as to whether Lane's lack of disclosure deprived Jefferson Pilot Financial of making accurate and reasoned underwriting decisions relative to Lane's mental health, and as to whether Lane's lack of disclosure is tantamount to concealing at least one manifestation of depression prior to the issue date of the policy.

Neither an incontestability clause nor a preexisting condition exclusion protects an insured who makes intentional misrepresentations in his applications, when medical conditions directly related to these misrepresentations later serve as the basis for claimed benefits. They

also do not serve to expand coverage where none exists. In this case, Lane made misrepresentations in his application regarding a "sickness" for which he now claims benefits – a "sickness" which does not fall within the Policy definition and is not covered under the Policy terms.

## III. CONCLUSION

A genuine issue of fact exists as to whether Lane fully disclosed his mental health history in his policy application; as to whether Jefferson Pilot Financial would have issued his policy with the same terms and conditions had he made full disclosure; and as to whether Lane misrepresented a disabling condition that had manifested prior to the issue date of the policy.

Wherefore, for the foregoing reasons, Lane's Motion for Partial Summary Judgment as to Jefferson Pilot Financial's Second and Third Affirmative Defenses should be denied.

THE DEFENDANT, JEFFERSON PILOT FINANCIAL INSURANCE COMPANY

By:________________________________

Pamela Levin Cameron
Federal Bar No. ct22659
Rogin, Nassau, Caplan, Lassman
& Hirtle, LLC
CityPlace I, 22nd Floor
185 Asylum Street
Hartford, CT 06103-3460
T: 860-278-7480/F: 860-278-2179
E-mail: pcameron@roginlaw.com

**CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed on this 9th day of March, 2004 to the following:

Robert M. Fleischer, Esq.
Gerry A. McMahon, Esq.
Jacobs Partners, LLC
Merritt View
383 Main Avenue
Norwalk, CT 06851

________________________________

Pamela Levin Cameron